FILED
12/28/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 3, 2018

# IN RE ANTONIO J., ET AL.[1]

**Appeal from the Juvenile Court for Davidson County**
**No. PT0000194085, 2012-002407, 2012-002409, 2012-002410**
**Sheila Calloway, Judge**

_____

**No. M2017-01833-COA-R3-PT**

_____

A mother placed the children that are the subject of this appeal with a child placement agency because she was unable to provide a stable home for them. Ten months later, the agency filed a petition to have the children declared dependent and neglected; the court appointed a guardian *ad litem* for the children and in due course declared the children to be dependent and neglected and continued custody with the agency. The guardian *ad litem* initiated this proceeding to have the mother's parental rights terminated on the grounds of abandonment by failure to visit and support, abandonment by failure to establish a suitable home, substantial non-compliance with permanency plans, and persistence of conditions; the agency later filed a separate petition on most of the same grounds also seeking termination of mother's rights. Following a trial, the court terminated the mother's rights on the grounds of abandonment by failure to visit, substantial non-compliance with the permanency plans, and persistence of conditions; the court also found that termination of mother's rights was in the children's best interest. The mother appeals, denying that grounds existed to terminate her rights and that termination was in the children's best interest; the guardian *ad litem* and agency appeal the failure of the court to sustain the ground of abandonment by failure to support. Upon our *de novo* review, we affirm the determination that the evidence established the grounds of abandonment by failure to visit, substantial non-compliance with the permanency plans, and persistence of conditions; we vacate the holding that termination of mother's rights was in the children's best interest and remand the case for further consideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Vacated in Part; Case Remanded**

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

David R. Grimmett, Nashville, Tennessee, for the appellant, Lenore G. E.

Jade Rogers Willis, Gallatin, Tennessee, for the appellees, Association for Guidance, Aid, Placement and Empathy, Inc.

Aderonke Kehinde, Mount Juliet, Tennessee, Guardian *ad litem*.

## OPINION

This case has its genesis in a petition filed on April 30, 2012, by the Association for Guidance, Aid, Placement, and Empathy, Inc., ("AGAPE"), a child-placement agency, to have the children that are the subject of this proceeding, Elizabeth J. (born July 2007), Joana J. (born November 2008), and Julie J. (born October 2009), along with their older sibling, Antonio J. (born January 2006), declared dependent and neglected. The children's mother, Lenore E., had placed the children in the physical custody of AGAPE on June 17, 2011, due to her inability to take care of them. Following a hearing on May 8, 2012, temporary custody of the children was given to AGAPE. On December 13, 2012, the court entered an order adjudicating the children to be dependent and neglected. The order noted that AGAPE and Mother had successfully completed a ninety-day trial home placement for Antonio and returned full custody of him to Mother but held that it was not in the best interest of the other children to be returned to Mother at that time; the parties agreed that the other children would be placed in Mother's home on a staggered schedule for ninety days beginning December 15, 2012. Permanency plans were prepared and ratified on August 23, 2012, April 15, 2013, and December 5, 2013.

On August 4, 2014, Aderonke Kehinde, the children's guardian *ad litem*, filed a petition to terminate Mother's parental rights to Elizabeth, Joana, and Julie, asserting as grounds: abandonment by failure to visit or support (Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i)); abandonment by failure to establish a suitable home (sections 36-1-113(g)(1) and 36-1-102(1)(A)(ii)); substantial non-compliance with the permanency plans (section 36-1-113(g)(2)); and persistence of conditions (section 36-1-113(g)(3)). The petition also alleged that termination of Mother's rights was in the children's best interest. Mother answered the petition, denying that grounds existed for the termination of her rights and that termination was in the best interest of the children. On December 4, AGAPE filed a separate petition to terminate Mother's rights, alleging the same grounds in support of termination except abandonment by failure to support.[2]

---

[2] Both petitions also sought to terminate the parental rights of the children's legal father, who was married to Mother when the children were born but was not listed as their father on their birth certificates, and the

Following a trial, the court sustained the grounds of abandonment by failure to visit, substantial noncompliance with the permanency plans, and persistence of conditions; after determining that grounds existed to terminate Mother's rights, the court considered the factors at section 36-1-113(i) and held that termination was in the children's best interest. Mother appeals, asserting that neither the grounds for termination of Mother's rights nor the finding that termination was in the children's best interest were proven by clear and convincing evidence; Mother also contends that the court's conclusions of law were not adequate for purposes of appellate review. In addition, the guardian *ad litem* and AGAPE contend that the record contains clear and convincing evidence of abandonment by failure to pay support.

AGAPE and the guardian *ad litem* concede that the case should be remanded as to the court's holding that termination was in the best interest of the children because the court did not consider and make findings as to all factors at section 36-1-113(i). While it is not necessary for the court to make findings as to all statutory factors in order to hold that termination of Mother's rights is in the best interest of the children, upon our review of the order terminating Mother's rights, we agree that the case should be remanded for further consideration of the best interest factors, as explained more fully hereinafter. In the interest of the expeditious resolution of this case and judicial economy, we shall proceed to address the sufficiency of the evidence relative to the grounds for termination.

## I. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and

children's natural father. The parental rights of the legal and biological fathers were not adjudicated in the proceeding and are not at issue on appeal.

3

convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## II. DISCUSSION

### A. Abandonment by Failure to Visit and Support

Tennessee Code Annotated section 36-1-113(g)(1) designates abandonment, as defined at Tennessee Code Annotated section 36-1-102(1)(A)(i), as a ground for terminating parental rights. Tennessee Code Annotated section 36-1-102(1)(A)(i) defines "abandonment":

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

In *In re Audrey S.*, the court discussed willfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . .
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal

4

code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (citations omitted).

With respect to this ground, the trial court held:

Pursuant to T.C.A. § 36-1-113(g)(1) and T.C.A. § 36-1-102(1)(A)([i]), [Mother] has willfully abandoned her children due to a failure to visit or to engage in more than token visitation as defined in T.C.A. § 36-1-102(1)(C) and T.C.A. § 36-1-102(2)(E) for the four months preceding the filing of the Guardian Ad Litem's Petition to Terminate her parental rights on August 4, 2014, as well as in the four months preceding the filing of AGAPE's Petition to Terminate her parental rights on December 4, 2014. Although [Mother] did some visitation, there were more occasions when she cancelled her scheduled visitation the night before or the day of the visit. Furthermore, there were a number of missed therapy appointments on [Mother's] behalf.

Mother first argues that the trial court erred in considering Mother's actions during both the four-month period preceding the filing of the Guardian's petition (April 3 to August 3) and the four-month period preceding the filing of AGAPE's petition (August 3 to December 3) in analyzing whether Mother abandoned the children by failing to visit them, and in failing to state the period of time it was relying on in making its findings.[3] She argues that the "four months period prior to the guardian ad litem's petition is the first and only relevant four month period for purposes of determining abandonment due to the fact that this initiated the termination proceeding pursuant to the statute." The distinction matters because Mother's fifth child was born April 6, 2014, three days after the four-month period began, as triggered by the guardian *ad litem*'s petition; Mother testified that the delivery was by C-section, with complications and accompanied by a

---

[3] The guardian *ad litem*'s petition was filed August 4, 2014, and AGAPE's petition was filed December 4, 2014; consequently the relevant time period was April 4 to August 3 for the guardian *ad litem*'s petition and August 4 to December 3 for AGAPE's petition. See *In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window for determining whether child support has been paid in the context of the ground of willful failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed. In other words, the last day of the four month period is the day before the petition is filed.").

5

hysterectomy, and resulted in her having an extended period of recovery well into the four month period. Mother argues that because she was on bed rest and unable to visit the children during this time, the evidence is not clear and convincing that her failure to visit was willful.

We agree with Mother that, under the facts and circumstances presented, the four-month period prior to the filing of the guardian *ad litem*'s petition–April 3 to August 3–is the relevant period for application of section 36-1-102(1)(A)(i). The guardian *ad litem*'s petition alleged, *inter alia*, that:

- The children were placed in the physical custody of AGAPE on June 17, 2011, as a result of Mother's inability to care for them, and adjudicated dependent and neglected on December 11, 2012
- The Mother willfully failed to visit or support the children in the four months preceding the filing of the petition

In its petition, AGAPE recites the history of its involvement in the dependent and neglect proceeding, as well as the efforts it has made while the children have been in custody; it does not allege any fact arising after the date the Guardian *ad litem*'s petition was filed or assert a new ground for termination. The pertinent wording of section 36-1-102(1)(A)(i) is clear and unambiguous: the period is the "four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights." There is no basis to apply a different four-month period than that measured by the Guardian's petition. Accordingly, inasmuch as Mother does not argue that she did visit or support the children in the pertinent four-month period, we look to the evidence she relies upon in asserting that her failure to visit was not willful.

The pertinent testimony cited by Mother regarding her post-delivery medical challenges states:

Q. And when you saying "recovering," what do you mean by recovering? How were you recovering?
A. I had two surgeries. I had my children by C-section, and when I had Caden there were complications from the surgery, and so I was in the hospital for a little while. They had the machines. They had the machines hooked up to me because I wasn't breathing on my own, and so I had to stay at home longer due to both of those complications.
Q. That was in April, 2014. How long was the recovery time?
A. For a normal C-section is usually about six months -- I mean six weeks, a little longer depending on the C-section, but with the other complications they recommended that I try to stay home a little longer than that.
Q. Did you have a hysterectomy?

6

A. Yes.

Q. Do you remember how long they told you to stay -- or did they tell you to stay in bed rest?

A. Yes.

Q. How long did they tell you to do that?

A. I don't remember. There was still some other procedures that they had to do. Once I got out of the hospital there was still some procedures that they hadn't finished when it came to -- from the surgery, and so I don't remember exactly how long we stayed.

Q. Other than the hysterectomy what other procedures did you have performed?

A. I lost a lot of blood.

Q. Anything else?

A. I don't remember. I was unconscious.

Q. So one petition was filed in August of 2014, so between April, 2014 and August, 2014, that would have been right around the time that you had this hysterectomy; is that right?

A. That's correct.

Q. And you're saying -- let me ask you. Did that have any kind of effect on your visitation?

A. It did. It had an effect on a lot of things. I first -- when I first got out of the hospital sometimes my days would be confused, you know. When I was in the hospital I lost a day or so.

My back -- I had problems with my back and my feet, but I kind of found another job once I had gotten -- when my son was born that April I went back to the airport and started working at Hudson Group.

Q. When was that?

A. Around May or June is when I started at the Hudson Group.

Q. That's May or June, 2014?

A. Correct, and I believe I was there about two months, but because of my back and my feet, I couldn't even go to a job.

Q. So between April and August, how many months were you working during April to August, 2014?

A. I wasn't at that point.

Q. What?

A. I wasn't at that point.

Q. So between April and August you were not working?

A. No.

Q. I thought you just said that you were working in May and June of 2014 at Hudson Group.

A. Yeah, sorry.

Q. Now this is important so I need you to listen to my question. Okay? Between April, 2014 and August, 2014, how many of those months were you working?

A. Two.

Q. And the other two months?

A. I don't know.

In response to Mother's argument, AGAPE cites the testimony of Mary Corwin, the caseworker who began working with the children in June 2013, who testified at length regarding Mother's visitation with the children, both prior to and during the April 3 to August 3, 2014, time period. The pertinent portions of her testimony are below, including testimony relative to visitation from January 2014 through July 2014, to give context to our analysis of Mother's contention that her failure to exercise visitation in the pertinent period was not willful.[4]

Q. Now let me take you back to January of 2014. How many visits did mother have in January of 2014?

A. She had a visit that's scheduled on January the 18th, which is one I previously testified was stopped because of the transportation arrangement for the children.

Q. Okay.

A. And it appears as though that's the only visit that took place in January.

Q. How many visits did she have in February of 2014?

A. I don't have any visits documented in my notes in February of 2014.

Q. What about March of 2014?

A. There was one on March the 19th of 2014.

* * *

Q. What about April -- so far we had one scheduled visit that didn't occur because mom didn't have a driver's license, so she didn't have the required things to be able to visit. We had no visits in February. We had one visit in March.

Now, based on the plan what was the minimum number of visits that was made to occur?

A. That was two.

Q. About two. Now what about April, 2014? How many visits did mom have?

---

[4] In this regard, Ms. Corwin also testified relative to medical and counseling appointments that took place over the January – August time frame, inasmuch as Mother's permanency plan contemplated that she would attend such appointments.

A. She had a visit on April the 19th of 2014, which had been postponed because she was leaving the hospital on April the 11th when the visit was originally scheduled for.

Q. Any other visit for the month of April?

A. Not other than attending the speech and language appointment with Joana.

Q. Now let me go back. Between January, 2014 and April, 2014 that we're now talking about, were there appointments for the children, either Elizabeth or Joana or the youngest one? Were there different medical appointments that mother could have attended?

A. Yes.

Q. Did she attend any in January?

A. No. She was scheduled to attend a counseling appointment with Elizabeth in January, and I received a text message stating that she was not able to make it.

Q. So what day was the appointment, that counseling appointment?

A. The appointment for counseling for Elizabeth was on January the 13th of 2014, which was a Monday, and on that day I received a text message from [Mother] stating that she could not make it to the counseling appointment on Tuesday and asked for the dates of upcoming appointments.

Q. And had she attended the January 13 appointment that would have been an opportunity for her to visit with Elizabeth. Isn't that true?

A. Correct.

Q. Were there any appointments scheduled for February, 2014 for any of the children?

A. I'm sorry. Did you say appointments?

Q. Yes. You've told the Court that there were no visits at all for February, but were there any appointments scheduled?

A. Yes. Joana had appointments on 2-11, 2-18 and 2-25 for speech and therapy.

Q. Did mother attend any of those appointments?

A. Not of those appointments, no.

* * *

Q. Now were any appointments set up for March of 2014, medical, dental, you know, for any of the children?

A. Yes. Joana had speech and language on March the 4th, and on March the 11th, March the 14th, March the 18th.

Q. So four possible appointments, or four appointments?

A. And also on March the 25th.

Q. So five appointments?

9

A. Correct.

Q. Did she attend -- [Mother] -- attend any of those appointments?

A. She attended the appointment on March the 25th of 2014.

Q. So she had a possible five, and she attended one, and she had one visit. Now, were there any -- I think you will testify that she attended speech. What about May? Were there any visits scheduled for May, 2014?

A. I'm sorry. Did you say visits or appointments?

Q. Visits. I'm sorry.

A. She visited with the children on May the 3rd.

Q. Any other visits?

A. There was a visit scheduled for May the 17th, which there was no confirmation call. There was a visit scheduled on May the 31st, and that visit did not take place as she stated that she had to work and could not make the visit.

* * *

Q. Let's go to June of 2014. How many visits did she have in June, 2014?

A. There was a visit scheduled for June the 14th of 2014, and it states -- my record states that [Mother] informed me that her work schedule had changed, and she could not make that appointment.

Q. So it was scheduled, but it did not occur. So no visits occurred in June of 2014?

A. No.

Q. Now did mother call you back after she had said to you she couldn't make that appointment? Did she call you back in June at all to see if she could reschedule the appointment?

A. No.

Q. Did any of the children have any appointments in June of 2014?

A. Yes.

Q. What appointments did they have, and who had appointments -- medical, dental, therapy, anything?

A. Joana had a speech and language appointment on June the 10th.

Q. Was that the only one?

A. That's the only one that I have noted.

Q. Did mother attend that one?

A. No.

Q. So even though she didn't have a visit, she could have visited with Joana if she had attended the therapy session, but she did not?

A. That's correct.

Q. Let's go to July of 2014.

A. Okay.

Q. How many visits occurred in July of 2014.

10

A. A visit occurred on July the 9th of 2014.

Q. Were any other visits scheduled?

A. A visit was scheduled on July the 21st of 2014, and again there was no confirmation call within the 24 hours prior to the visit.

Q. So the visit did not occur. So far based on your testimony, between January and July of 2014, mother had 14 possible opportunities to visit with the children, is that correct, because if she was doing every other week or twice a month, seven months from January to July would be 14 opportunities to visit?

A. Correct.

Q. How many times, based on your testimony, did she visit?

A. I mean, I can go back and re-count.

Q. And I can tell you. I'll let you go back and count.

A. I'm sorry. We're looking at January ...

Q. January to July of 2014. You testified that she did not visit the visit of January. There was one visit that was stopped so there was no visit in January. In February you testified that there was no visit. In March you testified that there was one visit?

A. Correct.

Q. In April you testified that there was one visit. You've testified that in May there was one visit, and in July there was one visit. By my calculations that is four visits in seven months. Would that be accurate?

* * *

A. Sorry. It will take me a few minutes to go back and confirm when visits took place. According to my notes I can find one visit in March, one in April, one in May and one in July for a total of four visits in that time period.

In light of the entire testimony on this issue, we are not persuaded by Mother's argument. The evidence shows the same pattern of Mother's missing opportunities to visit with her children before and after the birth of her last child in April; moreover, it shows that, despite any asserted physical limitations, Mother was able to work during the four month period. We conclude that Mother's failure to visit over that period was willful.[5]

With respect to the ground of abandonment by failure to support, the permanency plan dated November 22, 2013, and ratified on December 5, required Mother to pay $30

---

[5] Our resolution of this issue pretermits our consideration of AGAPE's contention that the court erred in allowing Mother and her boyfriend to testify relative to her medical condition, diagnosis, and treatment.

per month.[6]  Ms. Corwin testified that Mother did not make any payments between January and August 2014; she also testified that she was "not able to verify either by documentation or anything like that," that Mother was employed or otherwise "financially ready and able" to take the children.[7]  As to this ground, the trial court concluded:

> 4.  The Court does not find that clear and convincing evidence has been presented regarding whether or not [Mother] has abandoned her children by *willfully* failing to pay child support or only paying token support pursuant to T.C.A. § 36-1-113(1)(A)(i) and T.C.A. § 36-1-102(1)(D).  While [Mother] has not consistently made child support payments to AGAPE as required in the Permanency Plans, there is no clear and convincing evidence that this was willful and the support that she did pay was insignificant given her means as set out in T.C.A. § 36-1-102(1)(B).  Thus, this ground is not one of the conditions based on which this Termination of Parental Rights has been granted.

(Italics in original).

We agree with the trial court.  A failure to support is "'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. The trial court did not make any specific findings relative to whether Mother worked or had income during the four-month period preceding the filing of the petition, or as to her expenses during that period.  Upon our review, while there is some testimony in the record that Mother worked while the children have been in AGAPE's custody, the testimony does not establish what her income and expenses were during the period at issue.  As a consequence, there is not clear and convincing proof from which to conclude that Mother had the capacity to pay support during that period.

For the same reason, Appellees' argument that the court erred in failing to find that Mother abandoned the children by failing to support them is not well taken.

### B. Substantial Noncompliance with the Permanency Plans

The trial court held that Mother had not substantially complied with the requirements of the three permanency plans.  Mother first argues that the trial court "failed to make adequate conclusions of law in order to allow either the parties or this Honorable Court an opportunity to properly review the trial court's legal reasoning."

---

[6] It is not clear if Mother was to pay $30 per month per child, as appears from the wording of the plan, or if she was to pay a total of $30 per month for all of the children, as testified to by Ms. Corwin.

[7] This testimony was given in the context of discussing Mother's compliance with the permanency plans.

Alternatively, Mother argues that "the facts presented at trial do not meet clear and convincing evidence."

Contrary to Mother's first argument, the court made findings of fact separate from its conclusions of law, relative to each of the grounds for termination. Pertinent to this issue are the following findings:

13. Following the removal of the children, AGAPE made all reasonable efforts to assist the Respondent-Mother with finding a home and being able to provide financially for her children. AGAPE helped Respondent-Mother find her current apartment, seek monetary donations, and find transportation to and from court, visits with the children, appointments, IEP meetings, and other commitments. AGAPE provided these substantial transportation services to Respondent-Mother between June 2011 and May 2013.

14. Mr. Fox, AGAPE caseworker, testified that he gave Respondent-Mother a list of subsidized housing options in November 2011, but Respondent-Mother failed to make use of the list until February 2012, when Mr. Fox inquired and was told that [Mother] had lost the list. Mr. Fox further testified that he took Respondent-Mother to apply for housing and helped her find and obtain housing at Fallbrook Apartments in February 2012.

15. Mr. Fox also testified that he helped Respondent-Mother secure funds for living expenses by connecting her with a church which provided her gift cards for food and cash. Mr. Fox testified that he helped Respondent-Mother obtain her birth certificate because it was needed to apply for government benefits.

16. Mr. Fox testified he helped Respondent-Mother obtain DHS benefits by driving her to the DHS office several times to file and follow-up on her application. He testified that he helped her reach out to The Opportunities Industrialization Center (OIC) to help her find a job, but Respondent-Mother failed to attend her orientation that was scheduled for May 29, 2012 and did not follow up on the job opportunities provided to her.

***

19. Prior to this court proceeding, three sets of Permanency Plans had been developed and ratified: one on August 23, 2012, a subsequent one on April 15, 2013, and a final one on January 30, 2014. These plans required, in part, that Respondent-mother find safe and suitable housing, maintain a legal

13

source of income, maintain consistent visitation with the children, and pay child support for the children. Respondent-Mother testified AGAPE had made her aware of her obligations and responsibilities pursuant to the plans. Regardless, Respondent-Mother failed to comply with any of the plans and did not complete the actionable objectives which were set out in the plans.

20. The first Permanency Plan was created with the intent of returning the children home one by one for a trial home visit, but the Respondent-Mother did not comply with the requirement to maintain a legal source of income, so the gradual return was aborted and never subsequently completed.

21. The second Permanency Plan required, in part, that the Respondent-Mother visit with the children at least twice a month for two hours per visit and demonstrate an ability and willingness to comply with Elizabeth's therapies, necessary to address her educational needs. Respondent-Mother did not comply with these objectives, and consistently was late for visits, cancelled the visits the night before or the morning of the day they were scheduled to occur, and missed the vast majority of Elizabeth's therapy appointments, which she was notified about well in advance.

22. The third Permanency Plan required, in part, that Respondent-Mother participate in regular visits with her children, make monthly child support payments to AGAPE, and attend her children's scheduled appointments and treatment sessions in order to better understand the needs of her children. Respondent-mother failed to attend most of these meetings, did not make the required child support payments, and was often late or absent from her scheduled visits.

These are adequate findings from which to assess the sufficiency of the evidence to support the ground of substantial noncompliance, and we proceed to do so.

Mother voluntarily placed the children with AGAPE in June 2011; the dependent and neglect proceeding was initiated in April 2012, and the first permanency plan developed two months later. The reason for the children coming into AGAPE's custody was stated in the plan:

[Mother] had no housing, income or support and was living with a friend, but was informed that she had to move out with the children in several days. She was unable to keep the children safe and to provide food and ongoing shelter for them and had no support persons or relatives that could take the children into their care on a daily basis.

14

The plan also noted that each of the children that are the subject of this proceeding had been evaluated and found to have developmental/learning delays; as well, Mother's son had been diagnosed with autism and a heart defect. Thus, in addition to responsibilities specifically related to Mother's condition, the plan addressed the necessity for Mother to receive appropriate information, training, and support relative to the special needs of the children.

The plan contained certain "Missions" for Mother, identified as safety, well-being and permanency; within each "Mission" the plan contained statements of "Concern," "Needs," "Outcomes," and "Action Steps." Pertinent to this issue, are the following "Action Steps":

**Mission: Safety**
Concern: [Mother] has experienced childhood abuse and neglect, has been unable to establish a stable lifestyle, and has experienced some post-partum depression after the birth of Julie.

\* \* \*

Action Steps: [Mother] will complete a parenting assessment with a mental health component and will follow the recommendations of the assessment. The Agape caseworker will assist [Mother] with scheduling the assessment.

**Mission: Well Being**
Concern: Julie, Joana and Elizabeth have been evaluated by Tennessee Early Interventions and/or the School System and found to have developmental/learning delays.

\* \* \*

Action Steps: [Mother] will contact the Metro Nashville Public School System to become familiar with the procedure for continuing reunification services for Julie, Joana, and Elizabeth when they return to her home.

**Mission: Permanency**
Concern: [Mother] has obtained stable housing in Nashville but has not completed her GED and has not obtained stable employment.

\* \* \*

Action Steps: [Mother] will complete the process of obtaining Families First Benefits and will be assisted with transportation by the Agape caseworker.

15

[Mother] will continue her GED preparation and obtain job training and referral services through Nashville Opportunities Industrialization Center and/or Christian Women's Job Corp.

[Mother] will obtain daycare services for Daniel once her daycare vouchers are obtained in order to be able to maintain a job.

[Mother] will pay child support payments of $ _____ on a _____ basis, due on the _____ of each month in order to become financially invested in the care of her children. Payments may be made in person at the Agape office or sent by mail. A receipt will be provided by Agape when each payment is received.

The next plan was developed April 12, 2013, and was in substantially the same format as the prior plan. Pertinent portions of that plan read as follows:

**Mission:**     **Well Being**
Concern:     [Mother] failed to comply with requirements to keep Family First benefits on more than one occasion and does not have sufficient income to support herself and four children.

\* \* \*

Action Steps: [Mother] will reapply for Families First benefits.
[Mother] will comply with DHS and the Maximus program in order to keep the Families First benefits.

**Mission:**     **Well Being**
Concern:     [Mother] has not taken full advantage of the Metro Bus System but has obtained a car.

\* \* \*

Action Steps: [Mother] needs to use the Tennessee Drivers Manual to study for the driver's license test.
[Mother] will take the driver's license test.

**Mission:**     **Permanency**
Concern:     [Mother] has obtained stable housing in Nashville but has expressed an interest to move to Gallatin.

\* \* \*

Action Steps: [Mother] will maintain safe, stable housing of her own that can be considered long-term housing.

16

**Mission:** **Permanency**

Concern: [Mother] has not passed the complete G.E.D. test and does not have a high school diploma or GED to date.

* * *

Action Steps: [Mother] will reconnect with Nashville OIC, Metro Action Commission or a similar provider in order to complete prep training, resister for the test and pass the test.

**Mission:** **Permanency**

Concern: [Mother] has yet to obtain and maintain appropriate employment or other means of legal income.

* * *

Action Steps: [Mother] will reconnect with Nashville OIC or another similar provider and pursue job training and job placement.
[Mother] will comply with Maximus requirements to make applications for jobs.
[Mother] will make three job applications per day until she is approved for Families First benefits and/or obtains appropriate employment and a legal means of steady income.
[Mother] needs to obtain and maintain suitable employment and a legal means of steady income.
[Mother] will pay child support payments of $30.00 monthly due on the lst day of each month in order to become financially invested in the care of her children. Payments may be made by mail or in person to AGAPE. A receipt will be provided by AGAPE upon receipt of each payment.

The final plan was developed November 22, 2013, and contains the following pertinent information:

**Mission:** **Well Being**

Concern: [Mother] failed to comply with requirements to keep Family First benefits on more than one occasion. She is not currently receiving Families First benefits and it is believed that she does not have sufficient income to support herself and all four of her children.

* * *

Action Steps: [Mother] will reapply for Families First benefits.

17

[Mother] will comply with DHS and the Maximus program in order to keep the Families First benefits.

**Mission:     Well Being**
Concern:     [Mother] has not taken full advantage of the Metro Bus System as evidenced by her chronic lack of attendance at appointments/visitations. She indicates that she has obtained a vehicle; however, she only has a learner's permit at this time.

* * *

Action Steps: [Mother] needs to use the Tennessee Drivers Manual to study for the driver's license test.
[Mother] will take the driver's license test.
[Mother] will provide a copy of her driver's license to AGAPE
[Mother] will obtain and maintain adequate insurance coverage on her vehicle. Additionally, she will provide a copy of the insurance verification to AGAPE immediately upon the beginning of her coverage.
Until [Mother] can obtain her own drivers' license and insurance coverage, she may have to rely on others to help with transportation. Each driver she uses must be legally licensed with insurance coverage. Verification of each driver's license and insurance coverage must be provided to the AGAPE at least 48 hours prior to a visit in which that designated driver will be used.

**Mission:     Well Being**
Concern:     It is believed that [Mother] does not have adequate income to support herself and her four children. She does not have any Families First benefits coming in at this time and would have to pay all expenses out of her pocket if she cannot obtain and maintain her benefits through Maximus and DHS. [Mother] will develop a budget — inclusive of all her income sources and household expenses — to her to determine whether or not her income is truly sufficient to meet her ongoing needs.

* * *

Action Steps: [Mother] will schedule a time to meet with the AGAPE social worker to develop a working budget.
[Mother] will continue to follow her budget and will report changes in her income or expenses to the AGAPE caseworker on an ongoing basis as changes occur. The AGAPE case manager and [Mother] will both sign off on the budget that is developed and all parties and legal representatives will be provided with copies of the budget.

18

**Mission:**     **Well Being**

Concern:     In the past, [Mother] has gone for long periods of time without maintaining a job and a legal means of income.

\* \* \*

Action Steps: [Mother] indicates that she has been working at the same location (Freshen's Ice Cream inside the Nashville Airport) for the last several months. She will continue to maintain employment with the same employer or obtain employment that provides more hourly/financial stability.

[Mother] will provide paycheck stubs to the AGAPE caseworker. These should be accumulated and submitted at the end of each month. This will ensure that AGAPE is provided with ongoing verification of her employment.

**Mission:**     **Permanency**

Concern:     [Mother] has obtained stable housing in Nashville but has recently expressed an interest in moving to Gallatin.

\* \* \*

Action Steps: [Mother] will maintain safe, stable housing of her own that can be considered long-term housing. She will remain in the same residence that she currently lives and will not move unless an unforeseen emergency develops that is out of [Mother]'s control. If the need arises to move, she will immediately inform the AGAPE caseworkers of the situation.

**Mission:**     **Permanency**

Concern:     [Mother] has not shown a willingness or ability to be financially responsible for herself or her children.

\* \* \*

Action Steps: [Mother] has an outstanding balance of $1050 due and payable to Leaps and Bounds daycare in Nashville. This bill is from the time frame in which Julie and Joana had been returned to her care and this was their daycare provider during that time. This was complicated by the fact that [Mother] did not comply with Maximus and DHS requirements and lost her benefits including the day care vouchers which would have covered a majority of this now past due bill.) [Mother] will contact Mr. Bill Munson at Leaps and Bounds Preschool and will set up a payment arrangement with him to gradually pay off her outstanding balance. She

19

will then begin making the payments agreed upon and will continue making the payments until such time as the bill is paid in full.

[Mother] will pay child support payments of $30.00 monthly due on the 1st day of each month in order to become financially invested in the care of her children. Payments may be made by mail or in person to AGAPE. A receipt will be provided by AGAPE upon receipt of each payment.

Mother contends that the court failed to determine that the requirements under the plans were reasonable and related to remedying the conditions which led to their placement with AGAPE, and as a consequence, termination on this ground should be reversed. We do not agree. As noted in the excerpts from the plans quoted above, specific concerns, all related to the reason the children came into AGAPE's custody, were identified; in the two latter plans, Mother's areas of noncompliance were identified. The Magistrate that ratified each plan attested that "[t]he responsibilities outlined in the plan are reasonably related to the achievement of this goal, are related to remedying the conditions that necessitated foster care, and are in the best interest of the child(ren)." As noted in *In re Valentine*, notwithstanding the failure of the trial court to make a specific finding of the reasonableness of Mother's responsibilities as part of the order of termination, we review the issue *de novo*, 79 S.W.3d at 547; upon our review, we conclude that the requirements of the plan were reasonably related to remedying the conditions that necessitated AGAPE's involvement, particularly those responsibilities imposed on Mother, detailed above, that specifically addressed her lack of income and the stability necessary to provide a home for herself and four children, all with special needs.[8]

Mother does not argue that the findings quoted above are not supported by clear and convincing evidence or cite to evidence which preponderates against the findings; upon our review, there is ample testimony from the witnesses associated with AGAPE, as well as from the children's teachers, to support the specific findings, as well as the significance of Mother's failure to comply with the plan. Upon our review, we conclude that the record contains evidence that clearly and convincingly establishes Mother's substantial noncompliance with the permanency plans.

## C. Persistence of Conditions

Parental rights may be terminated on the basis of "persistence of conditions," as defined by Tennessee Code Annotated section 36-1-113(g)(3)(A), when:

---

[8] In this regard, we reject Mother's argument that "[i]t is counter-intuitive for the trial court, AGAPE or the Guardian ad litem to argue that the mother failed to comply with the requirements of the permanency plan when they returned [Antonio] home." Antonio was successfully placed with Mother following a 90-day trial placement; his return had no effect on the requirements of the plan relative to Mother and the other children.

20

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 550. With respect to this ground, this Court has held that "Tenn[essee] Code Ann[otated] [section] 36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

In concluding that termination on the ground of persistence of conditions was warranted, the court made the following factual finding:

23. The children have been removed from the home by an Order of this court since May 2012, and prior to that were in AGAPE's physical care since June 2011 due to the willful placement of the children in the care of AGAPE by Respondent-Mother. In the six years which have passed since the children were placed in AGAPE's care, they have been unable to return home due to a persistence of the conditions which led to their removal. There is little likelihood the conditions will change substantially enough for the children to return to Respondent-Mother's custody in the near future.

Mother first contends that the children were not removed from her home, as required by the statute; second, she argues that the record does not support a finding of persistence of conditions; third, she contends that AGAPE's caseworker acknowledged at trial that there were no conditions which prevented the children from returning to

Mother's home. Mother seeks a reversal of this ground or, alternatively, that the case be remanded for further consideration.[9]

As to Mother's first argument, the record shows that the court entered an order on May 8, 2012, finding, *inter alia*, that:

> [Mother] voluntarily placed the said children into temporary foster care with AGAPE as she does not have stable, suitable housing in which she and her children can live; she is unemployed and has no income to financially support herself and her children; and she has no extended family that can provide daily care and supervision of the children.

The court further held that it was not in the children's best interest to be returned to Mother and that it was in their best interest that AGAPE have temporary legal custody of them.

Another order entered on August 23, 2012, approving the initial permanency plan again stated, *inter alia*, that "it is against the best interests of the minor children to be returned to their parent(s) at this time, and that it is in the best interests of the minor children to continue in the custody of AGAPE." In the Order of Adjudication entered December 13, 2012, the court determined that the children "are dependent and neglected pursuant to Tenn, Code Ann. § 37-1-102(b)(12)(F) due to the fact that the mother is unable to care for the children without the assistance of others"; the court approved an agreement that the children remain in AGAPE's custody and that they begin staggered ninety day home placements with Mother. There is no basis for Mother's argument that the children were not removed from her home because she voluntarily placed them with AGAPE. The children came within the breast of the court when AGAPE filed its petition seeking a declaration that they be declared dependent and neglected and that custody be placed with that agency. The orders were consistent with the court's authority and responsibility under the statute and satisfied the requirement that the child be removed from the parent's home by order of the court.

Many of the trial court's findings as to Mother's non-compliance with the permanency plans apply equally to the ground of persistence of conditions and address Mother's second argument. Succinctly put, Mother placed the children with AGAPE in June of 2011, and the same conditions which led to their placement were present when the court rendered its decree six years later, save only that Mother had secured a place to live. We have reviewed the snippet of the testimony of Ms. Corwin of AGAPE that

---

[9] Specifically, Mother desires the case to be remanded for the trial court to "explain (1) what Order it is relying on in making its finding that the children were removed; (2) what condition existed at the time of removal; and (3) what condition persists at the time of trial preventing return of the children to the mother's custody."

Mother cites in support of her argument that no conditions persisted which prevented the children from being returned to Mother's home as of the date of trial and, considered in context, do not agree that it supports her argument. The dialogue between counsel and the witness took place during Ms. Corwin's cross-examination, in the midst of numerous and lengthy objections, when Ms. Corwin was asked about the requirements of the permanency plans; the testimony relied upon by Mother is best considered in an extended context:

Q.     And as far as the other grounds, you claim substantial non-compliance with the perm plan; correct?

A.     Yes.

Q.     And that's on paragraph 21; correct?

A.     Yes.

Q.     Let's talk about [Mother]'s responsibilities under the perm plan. Right now -- you said earlier that you don't know of any conditions that prevent the children from returning to the mother; correct?

A.     Yes.

Q.     And the primary reason we have a perm plan is to address the reasons that the children cannot return to the mother; correct?

A.     I'm sorry. Could you state that one more time?

Q.     Sure. The primary reason that we have a permanency plan is to address the reasons that the child cannot return to the parent; correct?

A.     Yes.

Q.     Because it outlines what the responsibilities are of the mother; correct?

A.     Yes.

Q.     And it outlines the action steps to be taken by the mother; correct?

A.     Yes.

Q.     And it outlines the action steps to be taken by AGAPE; correct?

A.     Yes.

Q.     Well, answer me this. If there are no conditions that prevent the children from returning to the mother, then what action steps are necessary under the perm plan?

        [AGAPE's counsel]: Your Honor, is he talking now or is he talking at the time we filed the petition? What time period is he talking?

        [Mother's counsel]: I can limit it.

        THE COURT: All right.

BY [Mother's counsel]:

Q.     At the time you filed your petition.

A.     At the time we filed our petition -- could you rephrase the question?

23

Q. Sure. At the time that you filed your petition, there were no conditions that prevented you from returning the children to the mother's home; correct? That's what you said earlier.

A. I don't believe that --

[AGAPE's counsel]: Your Honor, I object to that. I don't think that's what the record reflects.

[Mother's counsel]: Okay. Well, I'll ask.

BY [Mother's counsel]:

Q. At the time that you filed your petition, there were no conditions that prevented you from returning the children to the mother's home; correct?

A. Again, at the time that we filed our petition, I don't know what persist -- what conditions persisted, because I had asked for verification of items that had never been received.

* * *

Q. Tell me, Ms. Corwin -- you cannot state what the conditions were that prevented you from returning the children to the mother at the time the petition was filed, can you?

A. No, not at this time.

* * *

Q. And today -- as of January 8th, 2016 -- you cannot state what conditions prevented the children from returning to the mother's home at the time you filed your petition; is that correct?

A. I cannot make a definitive statement at this time.

Q. And as far as the substantial non-compliance with the perm plan -- again, the reason that we have a perm plan is to address the conditions which prevent return to parent; correct?

A. Correct.

Q. So as the representative of AGAPE, why have a perm plan if there are no conditions to remedy?

A. Because when the perm plan was implemented and ratified by the Court, there were situations to be remedied.

Q. Okay. But as of today, there are no situations to be remedied; correct?

A. I believe I've already testified that I believe that conditions do not exist as of today; the three that we've discussed today.

Viewed in context, and in light of other clear and convincing proof that Mother had not remedied the conditions that led to the children's placement with AGAPE and the court's

24

holding that the children were dependent and neglected, the foregoing testimony does not establish, as Mother contends, that there were no conditions preventing the children's return.

## D. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of nine factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The court's entire discussion of best interest is:

Having determined grounds exists for terminating Respondent-Mother's parental rights, the Court has further determined that to do so is in the best interest of the children. The Court has considered the non-exclusive factors found at T.C.A. §36-1-113(i) and makes the following findings by clear and convincing evidence:
1. Pursuant to T.C.A. § 36-1-113(i)(1), the Respondent-Mother has not made an adjustment of circumstances, conduct or conditions so as to make it safe and in the children's best interest to be in either of their homes. After more than six (6) years in AGAPE's care, the Respondent-Mother was not prepared on the day of trial to assume custody of the children.
2. Pursuant to T.C.A. § 36-1-113(i)(2), the Respondent-Mother failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible.
3. Pursuant to T.C.A. § 36-1-113(i)(3), Respondent-Mother has not maintained consistent, regular visitation or other contact with the children.
4. A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical condition pursuant to T.C.A. § 36-1-113(i)(5). The children currently reside in a foster home that is able to meet their individual medical, emotional, and educational needs. This is fundamental to the emotional, psychological, and medical well-being of the children.

Thus, the Court finds that the Petitioners, The Association for Guidance, Aid, Placement, and Empathy, Inc. and the Guardian *ad litem*, Ronke Kehinde, have proven by clear and convincing evidence that all the parental rights of said Respondent, [Mother], to said children be forever terminated; and therefore the complete custody, control, and guardianship of said children is hereby awarded to The Association for Guidance, Aid, Placement, and Empathy, Inc., with the right to place said children up for adoption and to consent to said adoption in loco parentis.

In her brief on appeal, Mother argues that the court ignored evidence relevant to the factors for which the court did not make a finding. As noted previously, the Guardian *ad litem* and AGAPE agree that the case should be remanded for the court to make findings as to the five additional statutory best interest factors. While it is not necessary that the court find that all nine factors weigh in favor of a finding that termination of Mother's rights is in the children's best interest, in our review of the court's determination in this case, it is important for this court to understand whether the trial court considered the other five factors to not be applicable, to be neutral or as militating against a holding that termination was in the children's best interest; if the court did consider the factors, the court should state the extent to which it weighed the factor in its analysis. For this reason, we vacate the best interest determination and remand the case for the court to make additional findings as to the other factors. To the extent appropriate, the court should make a fresh determination that the evidence clearly and convincingly supports a conclusion that termination of Mother's rights is in the children's best interest.

## III. CONCLUSION

For the foregoing reasons, we affirm the determination that he evidence established the grounds of abandonment by failure to visit, substantial non-compliance with the permanency plans, and persistence of conditions; we vacate the holding that termination of mother's rights is in the best interest of the children and remand the case for further consideration in accordance with this opinion.

_____
RICHARD H. DINKINS, JUDGE

26